UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,                :              05 Cr. 975 (RMB)
                                         :
                                         :
                                         :
                                         :
             v.                          :              <u>DECISION & ORDER</u>
                                         :
                                         :
RAMON DOMINGUEZ,                         :
                                         :
             Defendant.                  :
                                         :
------------------------------------------------------------X


I.      **Background**

        On June 22, 2006 Ramon Dominguez ("Defendant" or "Dominguez") was convicted by a

jury of one count of conspiracy to distribute or possess with intent to distribute five kilograms or

more of cocaine.  By motion, dated July 13, 2006 ("Defendant's Motion"), Dominguez moved

for a judgment of acquittal pursuant to Federal Rules of Criminal Procedure 29 ("Fed. R. Crim.

P. 29" or "Rule 29") on the grounds of (i) insufficient evidence, alleging that the Government

"failed to prove beyond a reasonable doubt that the (sic) Ramon Dominguez conspired or agreed

with anyone other than a government agent or a government informant, to violate the law."

Defendant's Motion at 1; and (ii) denial by the Court of a fair trial: (a) by "allow[ing]

inadmissible hearsay into evidence"; (b) through "a series of bad faith questions posed by the

government during cross examination of the defendant [which] inevitably led the jury to

conclude that Mr. Dominguez was a bad man who had committed heinous crimes including

murder, murder for hire, robbery of drug dealers, robberies from stash pads, and membership in a

criminal organization or crew."; (c)"during the government's cross-examination, the court gave

no limiting instruction to the jury that it was the answers and not the questions that were

evidence." Id. at 2.   By response, dated July 28, 2006 ("Government's Response"), the

Government opposed the Defendant's Motion.  The Government argues that the Court should

deny the Defendant's Rule 29 Motion because: (i) the Government proved convincingly that

Dominguez conspired with individuals other than government informants or agents to commit

the drug-robbery charged in the Indictment.  The evidence supporting this result includes

Dominguez's post-arrest confession, his recorded statements, and the testimony of four

witnesses; i.e. Confidential Source No. 2 ("CS2" or "CS-2"), Special Agent Rene Tirado

("Tirado"), Special Agent Robert Barrett ("Barrett"), and Senior Investigator John O'Keefe

("O'Keefe"); and (ii) the Defendant received a fair trial: (a) the Court properly admitted

testimony of law enforcement agents that was offered to explain their actions and to rebut

defense counsel's argument that they had improperly targeted the Defendant; (b) the

Government did not ask questions in bad faith during Dominguez's cross examination, and

requested and obtained the court's specific approval regarding certain lines of questions; and (c)

the Court properly instructed the jury that a witness's answers, and not counsel's questions,

constitute evidence and gave the jury this explicit instruction both at the start of and at the end of

the trial. Government's Response at 2.

## II.  Legal Standard

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an

acquittal," Fed. R. Crim. P. 29 (c), if the Court first determines that the evidence was insufficient

to sustain a conviction.  The Court is required to view the evidence "in the light most favorable

to the government" drawing all reasonable inferences in the government's favor.  United States

v. Autouri, 212 F.3d 105, 114 (2d Cir. 2000).  The Court may not assess the credibility of witnesses and "must uphold the jury's verdict if…'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  "In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."  United States v. Florez, 447 F.3d 145, 154-155 (2d Cir. 2006) (internal citation omitted).

### III. Analysis

#### (i) Sufficiency of the Evidence

 "With respect to whether there is sufficient evidence of a defendant's intent to participate in the conspiracy with knowledge of its unlawful objectives, there are two separate inquiries: the prosecution must show a) that the defendant had some knowledge of the unlawful object of the conspiracy, and b) that the defendant intended to engage in the unlawful scheme." United States v. Martinez-Sandoval, 2003 WL 1442454, *4 (S.D.N.Y. 2003).

During the trial, the Court heard testimony from Agent Rene Tirado, Agent Robert Barrett, Senior Investigator John O'Keefe, Confidential Source No. 2 and Defendant Ramon Dominguez.  The Court finds that the testimonial and exhibit evidence in the record supports the jury verdict and that, viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in the Government's favor, any rational trier of fact could have found  - - and, in this case, the jury did find - - the Defendant guilty of conspiracy to distribute or possess with intent to distribute at least five kilograms of cocaine beyond a reasonable doubt, under the (intent) standard set forth above.

Specifically, the Court finds that the following evidence adduced at trial supports the jury verdict against Mr. Dominguez:

1) CS-2 testified that he (CS-2), his cousin who was a confidential source for the government ("CS1" or "CS-1"), and the Defendant first met in August 2005 and discussed (on several occasions) stealing between 10-15 kilos of cocaine.  See Transcript dated June 20, 2006 at 132-135;

2) CS-2 testified that the Defendant stated to him: "Let me know as soon as you have the location and the address where the kilos would be, let me know as soon as you know so I can get my crew ready."  Id. at 134;

3) CS-2 testified that he overheard the Defendant talking to his cousin (CS-1) on the telephone and he heard the Defendant ask "whether the kilos were ready, whether they had arrived".  Id. at 137;

4) Recorded conversations among  CS-1, CS-2, and Dominguez were admitted into evidence which corroborated the testimony of CS-2 that Dominguez agreed to steal approximately fifteen kilograms of cocaine.  (See GX 109-T at 3 "You have to tell me where it is, because we have to see, we have to plan to see if I have to break in, maybe we have to do something." and GX 104-T at 5 "It's 15 . . . supposedly, yes.");

5) Recorded conversations among CS-1, CS-2, and Dominguez were admitted into evidence which corroborated the testimony of CS-2 that Dominguez  agreed he would enlist the aid of others (his "crew") to rob the cocaine.  (See GX 104-T at 7 "I'll bring people and whatever it is that's it." and GX109-T at 4 "I've got the people.");

-4-

6) Recorded conversations among CS-1, CS-2, and Dominguez were admitted into evidence in which Dominguez advised CS-1 that he and his crew would pretend to be policemen during the robbery. (See GX 104-T at 4 "And, we're going to jump out, [ ] with a car as though we were the police.");

7) Recorded conversations among CS-1, CS-2, and Dominguez were admitted into evidence wherein Dominguez asks CS-1 whether a gun would be necessary. (See GX109-T at 9 "I don't know, . . . do we have to bring a gun or something?");

8) Agent Tirado testified that he spoke to the Defendant on the telephone on August 30, 2005, posing as CS-1's contact with respect to the drugs. Tirado testified that he told the Defendant that the drugs were being stashed in a warehouse on 22nd Street between 10th and 11th Avenues in Manhattan and that he needed to get there quickly before the drugs were moved. See Transcript dated June 20, 2006 at 62;

9) Agent Tirado's testimony was corroborated by a tape recorded conversation between Tirado and the Defendant. (See GX114-T at 2-3 Agent Tirado stated that the building was located "on 22nd Street, between Tenth Avenue and the . . . West Side Highway." Dominguez responded: "Once we're there . . . we'll call you right away.");

10) Agent Tirado testified that he spoke again to the Defendant on August 30, 2005 and Dominguez informed him he "was somewhere near 8th Avenue"; Agent Tirado "instructed the defendant to come down to 22nd Street between 10th and 11th Ave". See Transcript dated June 20, 2006 at 62;

11) Agent Barrett testified that Dominguez arrived at the prearranged location at 22nd Street in a van with other individuals (including Juan Infante); Dominguez was observed exiting the van

with Infante, having a conversation with the occupants in the van, and pointing in the direction of the warehouse. Id. at 164;

12) Agent Tirado testified that after waiving his Miranda rights, Dominguez "admitted to being there [on 22nd Street between Tenth and Eleventh Avenue] to steal drugs" . . . "fifteen kilos of cocaine." See Id. at 44 and GX5;

13) Agent Tirado testified that, in Dominguez's post arrest statement, Dominguez admitted "that the other individuals that were with him were aware of the conspiracy to steal drugs and were involved in it". See Transcript dated June 20, 2006 at 45.

14) Agent Tirado testified that, in his post arrest statement, Dominguez also stated: "that he was conspiring with an individual by the name of Juan to steal drugs. He stated that Juan approached him a couple of weeks prior to that about stealing the drugs and that he agreed to steal them for Juan." Id. at 46.

15) Agent Tirado testified that CS-1's first name is Ramon and CS-2's first name is Pedro. Id. at 47.

Also, with regard to the crime of conspiracy, the jury was instructed, inter alia, by the Court as follows: "when I speak to you of two or more persons, I do not include as potential coconspirators any confidential informants. Their acts are not the acts of coconspirators, since they were operating under the direction of the government. Their statements are not the statements of coconspirators. Actions taken or statements made under the supervision of the government itself are not to be considered for these purposes. But [if you] find beyond a reasonable doubt that two or more persons, not acting in an undercover capacity, came to an understanding, express or implied, to violate the law and to accomplish an unlawful plan, then

-6-

the government will have sustained its burden of proof as to this element [the existence of the conspiracy]." See Transcript dated June 22, 2006 at 328.

In sum, it is reasonable to conclude, based upon the recorded statements of the Defendant, Defendant's post arrest confession, the testimony of CS-2 and the testimony of the law enforcement agents Tirado and Barrett, that Dominguez conspired with others, i.e., Juan and the other members of his crew, to rob heroin from the warehouse located on 22nd Street, in Manhattan.

**(ii) Fair Trial**

**(a) Alleged Hearsay**

Among other things, Defendant argues that the Court improperly allowed into evidence tape recordings of conversations between CS-1 (whom the Government did not call to testify as a witness) and Defendant Dominguez; and that the Court improperly allowed testimony by Government witnesses O'Keefe and Tirado regarding Defendant's willingness to steal drugs, his history of violence, and his association with a robbery crew. See Defendant's Motion at 5-10.

Recordings

The Court allowed the admission of tape recorded conversations of Dominguez and CS1, into evidence, not for the truth of the matter asserted therein, but to provide context for the Defendant's responses in those conversations on such recordings. See United States v. Paulino, 445 F.3d 211, 216 (2d Cir. 2006) ("It has long been the rule that so long as . . . statements are not presented for the truth of the matter asserted, but only to establish a context . . . , the defendant's Sixth Amendment rights are not transgressed . . . Nothing in *Crawford v. Washington* is to the contrary.") (internal citations and quotations omitted) and United States v. Barone, 913 F.2d 46,

49 (2d Cir. 1990) ("[T]he accused's right to confront and cross-examine witnesses is not violated when the government fails to produce as a witness at trial an informant who is heard in a tape-recorded conversation with the defendant.  So long as the informant's recorded statements are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused, the defendant's Sixth Amendment rights are not transgressed.").

The Court considered whether the "probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence".  See FRE 403 and determined that the statements were more probative than prejudicial.  See Transcript dated June 20, 2006 at 37 ("And having done the balancing test, I conclude that the statements are more probative than they are prejudicial.").  The Court also gave a limiting instruction to the jury prior to the tapes being played, as follows: "Before we play the tapes, ladies and gentlemen, I am going to give you an instruction that relates to the tapes.  You will hear on these tapes the voice of what is called and what has been referred to as CS1, and I want to give you this instruction with respect to CS1.  The statements of CS1 which you will hear on the government's recordings are not to be considered as evidence; they are only to be used to assist you in understanding the context of Mr. Dominguez's responses."  Id. at 80-81. See also the Court's final charges to the jury: "You should also remember my instruction that the statements of the person referred to as CS1, which you heard on government's recordings, are not to be considered by you as evidence.  They are only to be used to assist you in understanding the context of Mr. Dominguez's responses."  Transcript dated June 22, 2006 at 340.

In addition, defense counsel, Ms. Marion Seltzer, was advised that CS-1 was available to

-8-

be called as a witness by the defense and the Government would not object to CS1 being called as a hostile witness by the defense.   See Transcript dated June 20, 2006 at 34 ("We have no objection to her [Ms. Seltzer] calling him today as a hostile witness.")  The defense elected not to call CS1 as a witness.

Testimony

Defendant also argues it was improper for the Court to allow Agent Tirado to testify that CS1 told Tirado that he (CS1) spoke to the Defendant about Defendant's ability and willingness to steal 15 to 18 kilos of cocaine; and that it was improper for the Court to allow Investigator O'Keefe to testify that: "[T]he defendant contacted the confidential source - - [He] advised the confidential source that he had a group of people that would go out and rob what we call stash locations, whether it be drugs or money, after which he would give the confidential source a part of the proceeds. . . the defendant  presented himself [to the confidential source] as a robbery crew.  They tend to be violent. . . We then came up with a plan, and they showed up at the location.  If they didn't show up there, historically it tells us that they will show up someplace else and rob a different stash location."  See Defense Motion at 5-6 and Transcript dated June 20, 2006 at 170-171.

The Government responds that "the Court did not abuse its discretion when it admitted the testimony in question because it was offered not for the truth of the matter asserted, but to explain the agents' rationale for presenting Dominguez with the opportunity to commit a robbery of a drug stash."  Government's Response at 19.  The Government also argues that: "it was entirely appropriate for the Government to offer evidence to show that the agents acted in good faith and with ample basis when they targeted Dominguez.  In other words, because the agents'

-9-

testimony was offered to show the circumstances surrounding the events, providing explanation

fo such matters as the understanding or intent with which certain acts were performed, the

statements were not offered for a hearsay purpose and were therefore admissible." Id. at 19-20

(internal citation and quotations omitted).   The Government argues further that the statements in

question were not "offered or used for the truth of any matter asserted, but rather to provide

background and context to explain the agent's actions, in direct response to Dominguez's

argument that he agents had targeted him in bad faith."  Government's Response at 15.

       The Defendant's predisposition to commit the crime charged was an issue in the case.

See e.g. Defense Counsel Seltzer's opening statement: "[W]hat happened is they had some

fellow, . . . who they called CI1, who entrapped my client . . . he [Dominguez] has no history of

drug dealing.  He [Dominguez] has no history of committing serious crimes.  He [Dominguez]

has no history of possessing weapons.  He [Dominguez] has no history of violent acts.  He

[Dominguez] has no felony convictions.  He [Dominguez] had the bad luck to bump into this

fellow, whose name we are never going to know, in a pool hall and that's why he's here."

Transcript dated June 19, 2006 at 16-17; "Basically, what the defense is and what you're going

to learn is that Mr. Dominguez asserts that he has been entrapped." Id. at 20; and "[H]e

[Dominguez] never conspired with anybody and, . . . whatever he did, he was tricked or

entrapped into doing it." Id.   Ms. Seltzer also questioned Agent Tirado regarding his motives

for opening an investigation of Defendant Dominguez and, in response to questions posed by

Defense counsel Seltzer,  Agent Tirado explained his reasons.  See e.g., Transcript dated June

20, 2006 at 114-116, wherein Ms. Seltzer asked, "Now, at the time that you targeted my client,

Ramon Dominguez, were you aware that he had never previously sold drugs?"  Agent Tirado

stated, among other things, that he "was under the impression that he [Dominguez] did sell drugs"; and when Ms. Seltzer asked, "It was based upon what he [CS1] told you that you opened up this investigation?" Agent Tirado stated, among other things, "he [Dominguez] showed clearly that he was interested in robbing"; "According to the CS he had a history of violence."; "He [Dominguez] stated that he was willing to commit this robbery for the drugs." No objection was raised by defense counsel at the time these responses to her questions were elicited.

The Court finds that, in light of the fact that the Defendant's predisposition to commit the crime and the Government's basis for the investigation were issues during the trial, the statements of Agent Tirado and Investigator O'Keefe were properly admitted as background information related to the "sting" operation conducted by law enforcement in this case. See e.g. United States v. Tracy, 12 F. 3d 1186, 1201 (2d Cir. 1993) ("Most of the testimony challenged as hearsay was given by investigating agents, describing information received from informants during the course of the government's 1 ½ year investigation. The testimony was received as background information with respect to that investigation, and we see no abuse of discretion in its admission.") (internal citations omitted).

Further, the jury was instructed as follows: "Defendant Ramon Dominguez asserts as a defense that he was the victim of entrapment by an agent of the government. While the law permits government agents to trap an unwary criminally-minded person, the law does not permit the government agents to entrap an unwary innocent-minded person. Thus, a defendant may not be convicted of a crime if it was the government who gave the defendant the idea to commit the crime, and if he was not ready and willing to commit the crime before the government agent first

-11-

spoke with him.  On other hand, if a defendant was ready and willing to violate the law, and the government merely presented him with an opportunity to do so, that would not constitute entrapment. . . If, . . . you find some evidence that a government agent initiated the criminal acts charged in the indictment, then you must decide if the government has satisfied its burden to prove beyond a reasonable doubt that before being first approached by a government agent, the defendant was predisposed to commit the crime.  A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime and awaiting an opportunity to do so.  Predisposition may be shown by evidence of any of the following: (1) an existing course of criminal conduct similar to the crime for which the defendant is charged; (2) an already formed design on the part of the defendant to commit the crime for which he is charged; or (3) a willingness to commit the crime for which he is charged as evidenced by the defendant's ready response to the inducement.  If you find that the defendant was predisposed to commit the offense charged, then you should find that the defendant was not the victim of entrapment.  On the other hand, if you find that the government agent initiated the criminal acts charged in the indictment, and if you have a reasonable doubt as to whether the defendant was predisposed to commit the criminal acts charged in the indictment, then you must acquit the defendant." Transcript dated June 22, 2006  at 344-346.

### (b) Cross Examination of Defendant

Defendant argues that the Court allowed the Government to pose improper questions during cross examination of the Defendant and asserts the Government had no good faith basis to ask questions related to Defendant's alleged cocaine purchases and his alleged prior criminal history.  He also contends that the Government failed to "alert counsel and the court that

-12-

defendant would be asked about prior bad acts during cross-examination, preclud[ing] him from demanding a proffer of the factual basis for the questions.  He was unable to argue that the questions were improper or exceeded the permissible scope of cross examination, and he could not get an advance ruling from the court.  Depending upon the court's ruling, the defendant could then have made a decision whether or not to testify."  Defendant's Memorandum of Law at 5.  The Government responds that it was "entirely proper for the Government to cross examine Dominguez about his propensity to commit the crime charged. . . Here, when Dominguez chose to testify, and when defense counsel asserted that the agents targeted Dominguez without a good-faith basis to believe he was predisposed to commit the robbery, he opened the door to cross examination on his criminal history, and on the issues of his criminal knowledge and propensity."  Government's Response at 23.

The Government did not pose improper questions to the Defendant during cross examination.  For one thing, during the direct examination of the Defendant, defense counsel asked the Defendant the following questions which opened the door on cross examination to issues concerning, among other things, the Defendant's criminal history, as well as his predisposition to commit the drug offense at issue in the case:  "[D]id there come a time when you began using drugs?";  "[W]hat kind of drugs were you using?";  "[H]ave you ever been arrested before?"; "Have you ever been convicted of a crime?"; "[H]ave you ever owned a gun?"; "[H]ave you ever been involved in any form of violence?"; "Have you ever been part of any kind of groups that were committing robberies?"; "Do you know anything about those kind of people [the kind that commit robberies]?"; "Have you ever sold drugs?"; "[A]t 1:00 in the afternoon on August 30th of 2005, did you know anything about some robbery that you were

-13-

supposed to commit that day with a crew of people somewhere in lower Manhattan?"; "Did you have your crew lined up waiting back at home?"; "Did you have a crew?". See Transcript of proceedings held on June 20, 2006 at 183-202.

Second, prior to calling the Defendant as a witness, the Government provided the defense with notice of its intention to cross examine the Defendant about his prior criminal history. See Transcript dated June 20, 2006 at 152-153. Counsel for the Government stated during the trial, outside the presence of the jury, that it had issues that "would become immediately ripe if she [Ms. Seltzer] calls either [CS1 or Defendant] . . . The main issue is that the government has information that when the defendant and CS1 initially spoke in an unrecorded conversation, the defendant told CS1 a number of things, including that he [Defendant] could do robberies, that he [Defendant] wanted to do robberies, and he [Defendant] talked about a specific robbery. The defendant also told CS1 that he had done and could do murders for hire. The government would ask the court to permit us to cross-examine the defendant on that if he testifies . . . , because the defense has clearly put into play in this case the defendant's criminal history or lack thereof." Id.

Third, the jury was instructed as follows: "Defendant Ramon Dominguez asserts as a defense that he was the victim of entrapment by an agent of the government. While the law permits government agents to trap an unwary criminally-minded person, the law does not permit the government agents to entrap an unwary innocent-minded person. Thus, a defendant may not be convicted of a crime if it was the government who gave the defendant the idea to commit the crime, and if he was not ready and willing to commit the crime before the government agent first spoke with him. On other hand, if a defendant was ready and willing to violate the law, and the

-14-

government merely presented him with an opportunity to do so, that would not constitute

entrapment. . . If, . . . you find some evidence that a government agent initiated the criminal acts

charged in the indictment, then you must decide if the government has satisfied its burden to

prove beyond a reasonable doubt that before being first approached by a government agent, the

defendant was predisposed to commit the crime.  A defendant is predisposed to commit a crime

if he is ready and willing without persuasion to commit the crime and awaiting an opportunity to

do so.  Predisposition may be shown by evidence of any of the following: (1) an existing course

of criminal conduct similar to the crime for which the defendant is charged; (2) an already

formed design on the part of the defendant to commit the crime for which he is charged; or (3) a

willingness to commit the crime for which he is charged as evidenced by the defendant's ready

response to the inducement.  If you find that the defendant was predisposed to commit the

offense charged, then you should find that the defendant was not the victim of entrapment.  On

the other hand, if you find that the government agent initiated the criminal acts charged in the

indictment, and if you have a reasonable doubt as to whether the defendant was predisposed to

commit the criminal acts charged in the indictment, then you must acquit the defendant."

Transcript dated June 22, 2006 at 344-346.

        Thus, the cross examination of Defendant Dominguez was proper based, among other

things, upon the scope of the direct examination, as well as the entrapment defense.  See e.g.

United States v. Havens, 446 U.S. 620, 627 (1980) ("It is essential . . . to the proper functioning

of the adversary system that when a defendant takes the stand, the government be permitted

proper and effective cross-examination in an attempt to elicit the truth.") and United States v.

Vega, 589 F.2d 1147, 1152 fn3 ("There is little need to belabor the fact that unless great leeway

-15-

is afforded in the scope of impeachment cross examination some defendants would be able to frustrate the truth seeking function of a trial by presenting tailored defenses insulated from effective challenge.") (internal citations and quotations omitted).

### (c) Limiting Instruction

Defendant argues that Dominguez's right to a fair trial was violated because, "during the government's cross examination, the court gave no limiting instruction to the jury that it was the answers and not the questions that were evidence." Defense Motion at 2. The Government responds that "the Court did give this explicit instruction on three separate occasions during the trial [once in the beginning, and twice at the end in the final charge to the jury]." Government's Response at 25.

In its preliminary instructions to the jury, the Court stated: "The questions and objections of the attorneys are not evidence and neither is any testimony that I may instruct you to disregard." Transcript dated June 19, 2006 at 6. And, in its final charge the Court instructed the jury that: "What the lawyers have said in their opening statements or in their closing arguments or in their objections or in their questions is not evidence." Transcript dated June 22, 2006 at 316. "[R]emember that a question put to a witness is not evidence. It is only the answer that is evidence." Id. at 317. It was not error to decline to give a limiting instruction during the cross examination of the Defendant. See United States v. Dabish, 708 F. 2d 240, 243 (6th Cir. 1983) ("[T]he timing of such an instruction is best left to the trial judge's discretion.")

## IV. Conclusion

Viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in the Government's favor, the Court finds that a reasonable jury could

find  - - as the jury in this case did find - -  all the essential elements of the conspiracy charged in the Indictment beyond a reasonable doubt.  Defendant was not denied his constitutional right to a fair trial and his motion pursuant to Rule 29 is respectfully denied.

Sentencing is scheduled for October 30, 2006 at 2:30 p.m..  Sentencing submissions, if any, are due on October 10, 2006, and responses, if any, are due on October 17, 2006.


Dated: New York, New York
      October 4, 2006

RICHARD M. BERMAN, U.S.D.J.